ETS: USAO 2013R00212

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. MJG-15-016 |
| | * | |
| BEVERLY CARDEN, | * | (Conspiracy to Commit Mail and Wire |
| and | * | Fraud, 18 U.S.C. § 1349; Mail Fraud, 18 |
| KEVIN CARDEN, | * | U.S.C. § 1341; Wire Fraud, 18 U.S.C. § |
| Defendants. | * | 1343; Conspiracy to Commit Money |
| | * | Laundering, 18 U.S.C. § 1956(h); |
| | * | Money Laundering 18 U.S.C. § 1957; |
| | * | Filing False Tax Return, 26 U.S.C. § |
| | * | 7206(1); Failure to File Tax Return, 26 |
| | * | U.S.C. § 7203; Forfeiture) |
| | * | |

********

## INDICTMENT

### COUNT 1
**(Conspiracy to Commit Mail and Wire Fraud, 18 U.S.C. § 1349)**

The Grand Jury for the District of Maryland charges that:

#### Introduction

At all times relevant to this Indictment:

**A.    Parties, Persons, and Entities**

1.    Defendants **BEVERLY CARDEN and KEVIN CARDEN** were married to each other and lived in Bel Air, Maryland.

2.    Defendants **BEVERLY CARDEN and KEVIN CARDEN** owned and operated AccuPay, Inc., which was a payroll service company, located at 206 E. Churchville Road, Bel Air, Maryland 21014.

3.    Defendant **BEVERLY CARDEN** owned AccuPay, Inc. and oversaw all aspects of its business.

4.      Defendant **KEVIN CARDEN** was an employee of AccuPay and acted as the head of its "tax department."

## B.      State and Federal Employment Taxes

5.      Federal employment taxes with respect to a given employee consist of: (a) the portion of old age, survivor, and disability taxes, commonly referred to as "Social Security," that is owed by the employee, (b) the portion of the Social Security taxes that the employer is required to pay with respect to the employee; (c) the portion of hospital insurance, commonly referred to as "Medicare," that is owed by the employee; (d) the portion of the Social Security and Medicare taxes that the employer is required to pay with respect to the employee; and (e) federal income taxes that the employee owes and that the employer is required to withhold from the employee's paycheck.

6.      Federal law required that an employer file an IRS Form 941 (Employer's Quarterly Federal Tax Returns) each quarter which lists employees by name and social security number and lists the Social Security and Medicare taxes owed by the employee, the employer's portion of the employee's Social Security and Medicare taxes, and the employee's income tax withholding.  Federal law also required the employer to pay over to the IRS the total amount of those employment taxes.

7.      The State of Maryland also required employers to file Maryland State Form MW506, to withhold income taxes owed by their employees and to pay those taxes over to the Comptroller of Maryland, on a monthly, quarterly, or annual basis, depending on the amount of tax they are required to withhold.

8.      In order for an individual other than a taxpayer to represent the taxpayer before the IRS, the IRS required that the taxpayer file an IRS Form 2848, authorizing such

2

representation. That form required the taxpayer to specify which matters, such as a specific return for a specific period, were within the scope of the individual's representation.

### C.   AccuPay's Business

9.      Part of the payroll services that AccuPay offered to its clients was to (1) complete and file state and federal tax returns on IRS Form 941 and Maryland State Form MW506 on behalf of its clients, (2) collect funds from the clients to pay state and federal employment taxes that those clients owed, and (3) pay those taxes over to the IRS and the appropriate state taxing authority.

10.     For each pay period, AccuPay's clients sent their employees' hour, wage, and salary information to AccuPay. AccuPay employees then entered that information into a database that was part of AccuPay's proprietary computer system.

11.     After the hour, wage, and salary information was entered into AccuPay's computer database, an AccuPay employee generated on a specific computer terminal at AccuPay a computer file known as the "tax file." An AccuPay employee then provided the tax file to **KEVIN CARDEN**, who ran AccuPay's tax department.

12.     **BEVERLY CARDEN** and **KEVIN CARDEN** caused AccuPay's employees to create a "payroll register," and either (1) physical paychecks, for those clients who paid their employees with paper checks or (2) direct deposit paystubs, for those clients who paid their employees via direct deposit. Some of AccuPay's clients picked up these documents, along with other documents from AccuPay's offices. With respect to other clients, employees at AccuPay sent those documents to the clients by mail, interstate carrier, or courier.

13.     The payroll registers described the total hours worked by all the employer's employees along with the total wages, and salaries that all the employees earned. The payroll

registers also detailed the amount of state and federal employment taxes that the client owed for the period. Finally, the registers noted in a line titled "Total Withdrawal," the amount of money AccuPay was to withdraw from the clients' account, which **BEVERLY CARDEN** and **KEVIN CARDEN** were to use to pay the client's state and federal employment taxes and any filing fees. AccuPay's clients would separately pay AccuPay's fees by check.

14.    **KEVIN CARDEN** was responsible for (1) using the tax file to input the clients' payroll information into software that generated tax forms to be filed with the state and federal taxing authorities, and (2) for paying the clients' state and federal employment taxes to state and federal taxing authorities.

15.    To pay the taxes of its clients, **KEVIN CARDEN** electronically transferred funds representing the total amount of taxes owed by the client from the client's bank account to a bank account AccuPay held at First Mariner Bank, account number *7513. Funds were then transferred from account number *7513 to account number *7512, another account held by AccuPay at First Mariner. Finally, **KEVIN CARDEN** then transferred certain funds from account number *7512 to the IRS and from account number *7513 and account number *7449, another account at First Mariner held by AccuPay, to state taxing authorities.

### The Conspiracy

16.    From at least in or about 2006 continuing through in or about March 2013, in the District of Maryland and elsewhere, the defendants

**BEVERLY CARDEN and
KEVIN CARDEN**

did knowingly and willfully conspire, combine, confederate, and agree with each other and with other persons known and unknown to the Grand Jury to knowingly devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent

4

pretenses, representations, and promises ("the scheme to defraud") from their clients and the IRS and for the purpose of executing and attempting to execute the scheme to defraud through the use of interstate wires, the U.S. mails, and private and commercial interstate carriers in violation of 18 U.S.C. §§ 1341 and 1343.

### Object of the Scheme to Defraud

17.     The object of the scheme to defraud was to steal money that AccuPay's clients had set aside to pay the IRS and state taxing authorities. **BEVERLY CARDEN** and **KEVIN CARDEN** represented to AccuPay's clients that those funds had been paid to the relevant taxing authorities. By executing the scheme to defraud, the defendants **BEVERLY CARDEN** and **KEVIN CARDEN** fraudulently obtained at least $2,500,000.00.

### Manner and Means of the Conspiracy and Scheme to Defraud

18.     It was part of the conspiracy and scheme and artifice to defraud that **KEVIN CARDEN** electronically transferred or caused to be transferred on numerous occasions an amount *7512 to the IRS and from account number *7513 and account number *7449, another account at First Mariner held by AccuPay, to state taxing authorities less than the amount **KEVIN CARDEN** and **BEVERLY CARDEN** represented to their clients on the payroll registers was to be paid over to that taxing authority, and less than the amount actually owed by the client to that taxing authority.

19.     For example, from the third quarter of 2011 to the first quarter of 2013, **KEVIN CARDEN** and **BEVERLY CARDEN** represented to the AccuPay clients listed below that those clients owed the amount of federal taxes listed below. **KEVIN CARDEN** then withdrew that amount from those clients' accounts. **KEVIN CARDEN**, however, only paid over to the IRS the amount listed below:

5

| CLIENT | WITHDRAWN | PAID TO IRS | DIFFERENCE |
|---|---|---|---|
| BB, Inc. | $219,775.19 | $179,753.03 | $40,022.16 |
| AS, Inc. | $162,342.03 | $113,394.21 | $48,947.82 |
| JV, LLC | $88,085.01 | $45,404.68 | $42,680.33 |
| PBM, Inc. | $48,032.15 | $31,923.67 | $16,108.48 |
| TOTAL | | | $147,758.79 |

20.    It was further part of the scheme and artifice to defraud that between January 2011 through February 2013, **BEVERLY CARDEN** and **KEVIN CARDEN** transferred or caused to be transferred funds totaling more than $830,000.00 from First Mariner Bank account number *7513 to a personal account held in the name of **KEVIN CARDEN** and **BEVERLY CARDEN**, First Mariner account number *9101.

21.     It was further part of the scheme to defraud that **KEVIN CARDEN,** without AccuPay's clients' consent, caused to be listed AccuPay's address as the address of certain AccuPay clients on those clients' federal employment tax filings, causing all future IRS correspondence regarding the client to be sent to AccuPay, and not to the client.  The purpose for doing this was to ensure that the IRS sent all correspondence regarding those clients, including notices of underpayment, to AccuPay and not the client, so that the client was unaware that **KEVIN CARDEN** and **BEVERLY CARDEN** had failed to pay over the full amount of the tax owed that had been withdrawn from the client's account.

22.    It was further part of the scheme to defraud that **KEVIN CARDEN** and **BEVERLY CARDEN** made and caused to be made numerous misrepresentations and omissions of facts to their clients and to the IRS and Maryland state taxing authorities, including the following:

a.    **KEVIN CARDEN** and **BEVERLY CARDEN** represented to numerous AccuPay clients AccuPay that it would withdraw and pay over the full amount of state and federal employment taxes the clients owed, when in fact **KEVIN CARDEN** and **BEVERLY**

6

**CARDEN** withdrew the full amount of the taxes, but did not pay over that full amount to the IRS and the state of Maryland.

        b.    In the instances in which AccuPay's clients were notified by the taxing authority that they had not paid the taxes they owed in full, those clients confronted employees at AccuPay about the underpayment. In response, **KEVIN CARDEN** and **BEVERLY CARDEN** told those clients that the underpayment would be addressed or avoided their inquiries. **KEVIN CARDEN** further responded to the clients that the underpayment was due to (1) a mistake by the taxing authority; (2) an error made by AccuPay employees; and (3) the software AccuPay used to file tax returns. None of these reasons was true.

        c.    In or about late 2011, **KEVIN CARDEN** and **BEVERLY CARDEN** sent AccuPay's clients a notice titled "Urgent Tax Filer Notification" which introduced a new "Chief Financial Officer" at AccuPay who was purported to be "an Ivy League graduate with degrees in both Accounting and Law" who had "over thirty years' experience as a CPA . . . was a CPA . . . formerly a Special Investigator with the New Jersey Attorney General's office as well as a former IRS Special Agent." The letter further explained that this individual "is auditing all tax deposits and filings for all tax clients back to 2009 for correctness, compliance and completeness." The letter did not identify this individual by name. This notice was a misrepresentation. **KEVIN CARDEN** and **BEVERLY CARDEN** did hire a CPA who was former IRS revenue agent and former investigative auditor for the New Jersey Attorney General's office and who had attended, but not graduated from, an Ivy League institution, but that individual was hired to prepare the defendants' personal tax returns and AccuPay's corporate tax returns, not to audit any payments or filing made on behalf of AccuPay's clients.

d.     On or about February 13, 2012, **BEVERLY CARDEN** faxed a letter to the office of a United States Congressman in which she attempted to explain difficulties that AccuPay was having with the IRS.  In that letter, **BEVERLY CARDEN** referenced AccuPay's "new CFO" who was "an Ivy League graduate of Accounting and Law, a former IRS Special Agent as well as a Special Agent with the NJ State Attorney General's Office and has been a practicing CPA for over 30 years."  This is statement was also a misrepresentation.  As stated above, **KEVIN CARDEN** and **BEVERLY CARDEN** did hire a former IRS revenue agent and investigative auditor for the New Jersey Attorney General's office, but that individual was hired to prepare the defendants' personal tax returns and AccuPay's corporate tax returns, not to audit any payments or filing made on behalf of AccuPay's clients.

e.     To be able to contact the IRS regarding AccuPay clients' federal employment tax issues without those clients being aware of those issues, **BEVERLY CARDEN** affixed or caused to be affixed AccuPay's clients' signatures on IRS power of attorney forms, Forms 2848, without the clients' permission.

f.     In letters to the IRS, **KEVIN CARDEN** placed his signature at the bottom of letters to the IRS regarding AccuPay clients with the title "Executive Vice President," without indicating that he worked for AccuPay, and was not an employee of the AccuPay client.

23.     It was further part of the scheme and artifice to defraud that **KEVIN CARDEN** and **BEVERLY CARDEN** abused a position of public and private trust and used a special skill in a manner that significantly facilitated the commission and concealment of the offense.

18 U.S.C. § 1349

## COUNTS 2-4
### (Mail Fraud, 18 U.S.C. § 1341)

The Grand Jury for the District of Maryland further charges that

1. Paragraphs 1 through 15 and 17 through 23 of Count 1 are incorporated here.

2. On or about the dates listed below, in the District of Maryland and elsewhere, the defendants for the purpose of executing the scheme and artifice to defraud, did knowingly cause to be deposited any matter or thing whatever to be sent and delivered by a private and commercial interstate carrier and United States Mail, according to the directions thereon that is, the following:

| COUNT | DATE | DEFENDANT | DESCRIPTION |
|---|---|---|---|
| 2 | 4/1/2011 | KEVIN CARDEN | A letter sent by United States Mail by **KEVIN CARDEN** from AccuPay, Inc. in Bel Air, Maryland to DC, Inc. in Bel Air, Maryland. |
| 3 | 6/8/2012 | BEVERLY CARDEN; KEVIN CARDEN | A package sent from AccuPay Inc., in Bel Air, Maryland, by **BEVERLY CARDEN AND KEVIN CARDEN** to AS, Inc. in Nottingham, Maryland, containing a "payroll register" sent through the United Parcel Service ("UPS"), a private and commercial interstate carrier. |
| 4 | 1/25/2013 | BEVERLY CARDEN; KEVIN CARDEN | A package sent from AccuPay Inc., in Bel Air, Maryland, by **BEVERLY CARDEN AND KEVIN CARDEN** to AS, Inc. in Nottingham, Maryland, containing a "payroll register" sent through the UPS, a private and commercial interstate carrier. |

18 U.S.C. § 1341
18 U.S.C. § 2

## COUNTS 5-9
### (Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 15 and 17 through 23 of Count 1 are incorporated here.

2.      On or about the dates listed below, in the District of Maryland and elsewhere,

### KEVIN CARDEN

for the purpose of executing and attempting to execute the scheme and artifice to defraud, did

knowingly cause to be transmitted in interstate commerce by means of wire communication

certain signals, signs, and sounds, that is the following:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 5 | 9/26/2012 | An email sent in Bel Air, Maryland from a Gmail account, whose servers were outside the state of Maryland to an attorney representing JV, Inc., in Towson, Maryland. |
| 6 | 12/21/2012 | An email attaching a letter sent by an employee of AccuPay in Bel Air, Maryland from AccuPay's email account with Verizon, whose servers were in Carrolton, Texas and Tampa, Florida to the owner of PBM, Inc., in Baltimore, Maryland, at an email account with Mindspring, whose servers were in Atlanta Georgia. |
| 7 | 1/4/2012 | An ACH transfer of $6,043.79 from PNC bank account number *1411 in the name of BB Inc. to First Mariner Bank, account number *7513, which passed through the Federal Reserve's Accounts in Richmond, Virginia. |
| 8 | 10/10/2012 | An ACH transfer of $11,711.11 from M&T Bank account number *2584 in the name of PBM, Inc. to First Mariner Bank, account number *7513, which passed through the Federal Reserve's Accounts in Richmond, Virginia. |
| 9 | 1/18/2013 | An ACH transfer of $8,400.50 from Bank of America account number *3465 in the name of JV, LLC to First Mariner Bank, account number *7513, which passed through the Federal Reserve's Accounts in Richmond, Virginia. |

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT 10
### (Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h))

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 15 and 17 through 23 of Count 1 are incorporated here.

2. From at least in or about 2012, and continuing through in or about March 2013 in the District of Maryland and elsewhere,

**BEVERLY CARDEN and
KEVIN CARDEN**

did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code Section 1957, to wit: to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, that is First Mariner Bank, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, offenses alleged in Counts 1 through 9.

### Manner and Means of the Conspiracy

3. The manner and means used to accomplish the objectives of the conspiracy included, among others, the following.

4. **KEVIN CARDEN** transferred funds from the bank accounts of AccuPay's clients to account number *7513 at First Mariner Bank in the name of AccuPay, representing to the clients that those funds would be paid to the appropriate taxing authority. Funds were then transferred from account number *7513 to account number *7512, another account held by AccuPay at First Mariner.

11

5.    **KEVIN CARDEN** then transferred certain funds from account number *7512 to the IRS and from account number *7513 and account number *7449, another account at First Mariner held by AccuPay, to state taxing authorities. **KEVIN CARDEN,** however, failed to pay over to the appropriate taxing authority all of the funds he withdrew from AccuPay's clients' bank accounts. Accordingly, the funds retained in account number *7513 and not paid over to the IRS constituted proceeds of a specified unlawful activity, that is, the offenses alleged in Counts 1 through 9.

6.    **BEVERLY CARDEN** and **KEVIN CARDEN** transferred funds from First Mariner account number *7513 in the name of AccuPay, Inc. to First Mariner account number *9101 in the name of Beverly and Kevin Carden and wrote checks from First Mariner account number *7513 that they then deposited in to First Mariner account number *9101 in the name of Beverly and Kevin Carden. Between January 2011 through February 2013, **BEVERLY CARDEN** and **KEVIN CARDEN** transferred or caused to be transferred funds totaling more than $830,000.00 from First Mariner Bank account number *7513 to account number *9101.

7.    **KEVIN CARDEN** and **BEVERLY CARDEN** then made payments from First Mariner account number *9101, toward the balance on a credit card account at American Express in the name of **KEVIN CARDEN** and **BEVERLY CARDEN,** and at least one of such payments included $10,000 or more of proceeds of Counts 1 through 9.

18 U.S.C. § 1956(h)

12

## COUNTS 11-13
### (Money Laundering, 18 U.S.C. § 1957)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 15 and 17 through 23 of Count 1 are incorporated here.

2.      On or about the dates set forth below, in the District of Maryland, and elsewhere,

### BEVERLY CARDEN and
### KEVIN CARDEN

did knowingly engage and attempt to engage in the following monetary transactions by, through,

or to a financial institution, that is First Mariner Bank, affecting interstate commerce, in

criminally derived property of a value greater than $10,000, that is a transfer of funds, such

property having been derived from a specified unlawful activity, that is, the conspiracy to

commit mail and wire fraud and mail and wire fraud as alleged in Counts 1 through 9:

| COUNT | DATE | MONETARY TRANSACTION | AMOUNT |
|-------|------|----------------------|--------|
| 11 | 4/26/2012 | A payment from account number *9101 at First Mariner Bank to American Express. | $15,000.00 |
| 12 | 10/5/2012 | A payment from account number *9101 at First Mariner Bank to American Express. | $12,000.00 |
| 13 | 12/31/2012 | A payment from account number *9101 at First Mariner Bank to American Express. | $13,517.25 |

18 U.S.C. § 1957
18 U.S.C. § 2

13

## COUNT 14
### (Filing False Tax Return, 26 U.S.C. § 7206(1))

The Grand Jury for the District of Maryland further charges that on or about April 13, 2012, in District of Maryland,

## BEVERLY CARDEN and
## KEVIN CARDEN

residents of Bel Air, Maryland, did knowingly willfully make and subscribe a U.S. Individual Income Tax Return, for the calendar year 2011, which was verified by a written declaration that it was made under the penalties of perjury and which they did not believe to be true and correct as to every material matter. Line 22 of that U.S. Individual Income Tax Return, IRS Form 1040, which was filed with the IRS, represented that the joint total income of **BEVERLY CARDEN AND KEVIN CARDEN** in 2011 was $83,319.00, whereas, as they then and there well knew, their joint total income in 2011 was substantially in excess of that amount in addition to the amount.

26 U.S.C. §7206(1)
18 U.S.C. § 2

## COUNT 15
### (Filing False Tax Return, 26 U.S.C. § 7206(1))

The Grand Jury for the District of Maryland further charges that on or about April 3, 2013, in District of Maryland,

### KEVIN CARDEN

a resident of Bel Air, Maryland, did knowingly willfully make and subscribe a U.S. Individual Income Tax Return, for the calendar year 2012, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter. Line 22 of that U.S. Individual Income Tax Return, IRS Form 1040, which was filed with the IRS, represented that the total income of **KEVIN CARDEN** in 2012 was $46,954.00, whereas, as he then and there well knew, his total income was substantially in excess of that amount in addition to the amount.

26 U.S.C. §7206(1)
18 U.S.C. § 2

## COUNT 16
### (Failure to File Tax Return, 26 U.S.C. § 7203)

The Grand Jury for the District of Maryland further charges that during the calendar year 2012,

### BEVERLY CARDEN

who was a resident of Bel Air, Maryland had and received gross income in excess of $20,000. By reason of such gross income, she was required by law, following the close of the calendar year 2012 and on or before April 15, 2013, to make an income tax return to the Internal Revenue Service Center, at Baltimore, Maryland, to a person assigned to receive returns at the local office of the Internal Revenue Service at Baltimore, Maryland or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of her gross income and any deductions and credits to which she was entitled. Well knowing and believing all of the foregoing, she did willfully fail, on or about April 15, 2013 in the District of Maryland and elsewhere, to make an income tax return.

26 U.S.C. § 7203
18 U.S.C. § 2

## FORFEITURE

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of an offense in violation of 18 U.S.C. §§ 1341; 1343; and 1349, each defendant shall forfeit to the United States of America all property, real and personal, which constitutes and is derived from proceeds traceable to the scheme to defraud.

2.      Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of the offenses in violation of 18 U.S.C. §§ 1956(h) and 1957, the defendants shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.

3.      The property to be forfeited includes, but is not limited to:

    a.      a sum of money equal to the value of the proceeds of the scheme to defraud, which amount is at least $2,500,000; and

    b.      The real property located at 507 Weatherby Road, Bel Air, Maryland 21015.

4.      If any of the property described above, as a result of any act or omission of the defendants:

    a.      cannot be located upon the exercise of due diligence;

    b.      has been transferred or sold to, or deposited with, a third party;

    c.      has been placed beyond the jurisdiction of the court;

    d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

17

18 U.S.C. § 981 (a)(1)(C)
18 U.S.C. § 982 (a)(1)
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1349
18 U.S.C. § 1956(h)
18 U.S.C. § 1957
28 U.S.C. § 2461(c)
Rule 32.2(a), Fed. R. Crim. P.

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

A TRUE BILL:

**SIGNATURE REDACTED**

Date

Foreperson

18